## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DOREEN EDWARDS, *et al.*,

Plaintiffs,

v.

AURORA LOAN SERVICES, LLC, *et al.*,

Defendants.

No.  09-cv-02100-HHK

### AURORA LOAN SERVICES, LLC'S
### MOTION TO DISMISS

Defendant Aurora Loan Services, LLC ("Aurora"), moves pursuant to Fed. R. Civ. P.

12(b)(6), to dismiss plaintiffs' complaint for failure to state a claim upon which relief can be

granted.

A memorandum of law in support of this motion and a proposed order are submitted

herewith.

Dated: January 25, 2010

By:    */s/ Michael J. Agoglia*

Michael J. Agoglia (*pro hac vice*)
Wendy M. Garbers (*pro hac vice*)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105-2482
Telephone: 415.268.7000

Tim A. O'Brien (D.C. Bar #484700)
MORRISON & FOERSTER LLP
2000 Pennsylvania Ave., NW
Washington, D.C.  20006-1888
Telephone: 202.887.1500

*Attorneys for Defendant*
*AURORA LOAN SERVICES, LLC*

**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that on January 25, 2010, I caused a true and correct copy of the foregoing to be electronically filed with the Clerk of the District Count using the CM/ECF system, which sent notification of such filing to all counsel of record.

Dated: January 25, 2010

/s/   *Tim A. O'Brien*
                      Tim A. O'Brien

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DOREEN EDWARDS, *et al.*,

                Plaintiffs,

    v.

AURORA LOAN SERVICES, LLC, *et al.*,

                Defendants.

No.  09-cv-02100-HHK

**AURORA LOAN SERVICES, LLC'S MEMORANDUM**
**<u>IN SUPPORT OF ITS MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................... 3

    A.    The HAMP Program ..................................................................... 3

    B.    Plaintiffs' Complaint ..................................................................... 9

MOTION TO DISMISS STANDARD ............................................................................... 10

ARGUMENT ...................................................................................................................... 12

I.    PLAINTIFFS' BREACH OF CONTRACT CLAIM FAILS BECAUSE THEY ARE NOT PARTIES TO THE CONTRACT AND LACK STANDING TO ENFORCE IT ............................................................................................................ 12

    A.    Plaintiffs Are Not Intended Third-Party Beneficiaries Under the SPA .............. 12

    B.    Plaintiffs Are Presumed To Be Incidental Beneficiaries ..................................... 15

    C.    The Parties to the HAMP Contract Did Not Intend to Expose Themselves to Potentially Millions of Lawsuits ........................................................................ 16

    D.    Plaintiffs' Complaint Does Not Demonstrate That Their Intended Beneficiary Theory Is Plausible ......................................................................... 17

    E.    Plaintiffs' Contract Claim Is a Specious Attempt to Create a Private Right of Action Under EESA, Where None Exists ........................................................ 18

II.    PLAINTIFFS' CLAIMS ALSO FAIL BECAUSE THEY DO NOT ALLEGE INJURY AND THUS LACK STANDING TO PROSECUTE THE CLAIMS ............. 20

III.    PLAINTIFFS' CLAIM FOR BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING FAILS FOR THE SAME REASONS THAT THE BREACH OF CONTRACT CLAIM FAILS ................................................................. 21

IV.    PLAINTIFFS' DUE PROCESS CLAIM FAILS BECAUSE PLAINTIFFS LACK A COGNIZABLE PROPERTY INTEREST ................................................................. 22

    A.    Neither EESA, nor HAMP Guidelines, nor the SPA Gives Rise to a Protected Property Interest ................................................................................... 22

    B.    Plaintiffs' Status As Mere Applicants for Loan Modifications Further Undermines Their Due Process Claim .................................................................. 25

V.    PLAINTIFFS' DUE PROCESS CLAIM ALSO FAILS BECAUSE AURORA IS NOT A GOVERNMENT ACTOR ............................................................................... 26

VI.    THE PROCEDURAL PROTECTIONS ALREADY IN PLACE SATISFY DUE PROCESS UNDER *MATHEWS* ............................................................................... 28

**TABLE OF CONTENTS**
**(continued)**

**Page**

VII.   THE COURT SHOULD DEFER TO TREASURY'S RULE-MAKING
AUTHORITY UNDER THE DOCTRINE OF PRIMARY JURISDICTION ............... 31

CONCLUSION .......................................................................................................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC,*
    637 F. Supp. 2d 185 (S.D.N.Y. 2009) ..................................................................... 17

*\*Am. Mut. Mfrs. Ins. Co. v. Sullivan,*
    526 U.S. 40 (1999) ..................................................................................... 26,27

*\*Ashcroft v. Iqbal,*
    -- U.S. ---, 129 S. Ct. 1937 (2009) ..................................................... 10, 11, 17, 28

*\*Bd. of Regents v. Roth,*
    408 U.S. 564 (1972) ...................................................................................... 22, 23, 24

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ............................................................................ 10, 11, 12, 18

*Centex Corp. v. United States,*
    395 F.3d 1283 (Fed. Cir. 2005) ..................................................................... 21

*Conley v. Gibson,*
    355 U.S. 41 (1957) ......................................................................................... 10

*Davis Moreno Constr., Inc. v. Frontier Steel Bldgs. Corp.,*
    No. CV-F-08-854, 2009 U.S. Dist. LEXIS 104256 (E.D. Cal. Nov. 9, 2009) ........................ 17

*\*Escobedo v. Countrywide Home Loans, Inc.,*
    No. 09-cv-1557, 2009 U.S. Dist. LEXIS 117017 (S.D. Cal. Dec. 15, 2009) ................. *passim*

*Far East Conference v. United States,*
    342 U.S. 570 (1952) ...................................................................................... 32, 33

*Gaitan v. Mortg. Elec. Registration Sys.,*
    No. 09-cv-1009, 2009 U.S. Dist. LEXIS 97117 (C.D. Cal. Oct. 5, 2009) ............................ 19

*Glass v. United States,*
    258 F.3d 1349 (Fed. Cir. 2001) ..................................................................... 13

*Grochowski v. Phoenix Constr.,*
    318 F.3d 80 (2d Cir. 2003) ........................................................................... 19, 20

*Huxtable v. Geithner,*
    No. 09-cv-1846, 2009 U.S. Dist. LEXIS 119418 (S.D. Cal. Dec. 23, 2009) ........................ 28

*Jones v. Barnes,*
    463 U.S. 745 (1983) ........................................................................... 30, 31

*\*Klamath Water Users Protective Ass'n v. Patterson,*
    204 F.3d 1206 (9th Cir. 2000) ........................................................... 13, 15

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ........................................................................... 20, 21

*\*Lyng v.Payne,*
    476 U.S. 926 (1986) ........................................................................... 25, 26

*Manganaro Corp. v. Jefferson at Penn Quarter, L.P.,*
    Civ. No. 04-2133, 2005 U.S. Dist. LEXIS 35714 (D.D.C. Aug. 8, 2005) .......................... 4, 13

*\*Mathews v. Eldridge,*
    424 U.S. 319 (1976) ........................................................................... 28, 29

*McAdams v. McCord,*
    584 F.3d 1111 (8th Cir. 2009) ................................................................ 10

*Morrissey v. Brewer,*
    408 U.S. 471 (1972) ........................................................................... 28

*Orff v. United States,*
    358 F.3d 1137 (9th Cir. 2004) ................................................................ 15

*Nat'l Collegiate Athletic Ass'n v. Tarkanian,*
    488 U.S. 179 (1988) ........................................................................... 26

*Price v. Pierce,*
    823 F.2d 1114 (7th Cir. 1987) ................................................................ 16

*Rank v. Nimmo,*
    677 F.2d 692 (9th Cir. 1982) ................................................................. 27

*Reed v. Village of Shorewood,*
    704 F.2d 943 (7th Cir. 1983) ................................................................. 24

*Rendell-Baker v. Kohn,*
    457 U.S. 830 (1982) ........................................................................... 27

*SEC v. Prudential Securities, Inc.,*
    136 F.3d 153 (D.C. Cir. 1998) ................................................................ 13

*Smith v. Cent. Ariz. Water Conservation Dist.,*
    418 F.3d 1028 (9th Cir. 2005) ................................................................ 15

iv

*Spark v. Catholic University*,
    510 F.2d 1277 (D.C. Cir. 1975) ............................................................ 27

*\*Syntek Semiconductor Co., Ltd. v. Microchip Tech. Inc.*,
    307 F.3d 775 (9th Cir. 2002) .......................................................... 31, 32

*United States Parole Comm'n v. Geraghty*,
    445 U.S. 388 (1980) ...................................................................... 20, 21

*United States v. Culliton*,
    328 F.3d 1074 (9th Cir. 2003) ............................................................ 32

*United States v. Western Pac. R.R. Co.*,
    352 U.S. 59 (1956) ........................................................................ 32, 33

*Vanover v. Hantman*,
    77 F. Supp. 2d 91 (D.D.C. 1999) ....................................................... 4, 13

*Walters v. Nat'l Ass'n of Radiation Survivors*,
    473 U.S. 305 ......................................................................................... 31

*Warren v. Gov't Nat'l Mortgage Ass'n*,
    611 F.2d 1229 (8th Cir. 1980) ........................................................... 27

*\*Williams v. Geithner*,
    Civ. No. 09-1959, 2009 WL 3757380 (D. Minn. Nov. 9, 2009) .................... *passim*

*Woodsmall v. Lyng*,
    816 F.2d 1241 (8th Cir. 1987) ........................................................... 30

## STATUTES, RULES & REGULATIONS

12 U.S.C.
    § 5201 ............................................................................................ 3, 16
    § 5214 ................................................................................................. 19
    § 5219 ............................................................................................ 22, 32
    § 5226 ................................................................................................. 19
    § 5229 ............................................................................................ 18, 19
    § 5233 ................................................................................................. 19

Emergency Economic Stabilization Act of 2008
    Pub. L. No. 110-343, 122 Stat. 3765 ("EESA") ............................... *passim*

Fed. R. Civ. P.
    8 ......................................................................................................... 10
    12(b)(6) .............................................................................................. 10

Restatement (Second) of Contracts
  § 313 cmt. a ........................................................................................................ 18

## OTHER AUTHORITIES

H.R. Rep. No. 111-19 (2009) ........................................................................... 30

154 Cong. Rec.
  H10766 (daily ed. Oct. 3, 2008) (statement of Rep. Kucinich) ............................ 23
  H10778 (daily ed. Oct. 3, 2008) (statement of Rep. Jackson-Lee) ........................ 23
  H10791 (daily ed. Oct. 3, 2008) (statement of Rep. Udall) .................................. 23

Treasury's "*Base Net Present Value Model Documentation*" ver. 3.0 (Dec. 8, 2009) .......... *passim*

Treasury's "*Base Net Present Value Model Specifications*" (June 11, 2009).................... 7, 24, 25

Treasury's "*Home Affordable Modification Program Guidelines*" (March 4, 2009) .................. 24

Treasury's "*Servicer Performance Report Through December 2009*" .................................... 1, 7

Treasury's Supplemental Directive
  09-01 (Apr. 6, 2009).......................................................................................*passim*
  09-08 (Nov. 3, 2009) ......................................................................................*passim*

RONALD B. ROTUNDA & JOHN E. NOWAK, *Treatise on Constitutional Law*,
  § 17.5(c) (4th ed.)....................................................................................... 25, 26

## INTRODUCTION

Like a number of other loan servicers, Aurora Loan Services, LLC ("Aurora") voluntarily answered the government's call to help stave off "avoidable foreclosures" by modifying loans in cases where it made economic sense to do so and where the investor-servicer agreement under which Aurora was operating did not forbid it.  Statistics maintained by the U.S. Department of the Treasury ("Treasury") demonstrate that Aurora's performance in modifying eligible loans under the Home Affordable Modification Program ("HAMP") has been exemplary.  Aurora's track record of extending HAMP modification offers is so good that it ranks in the top third of participating loan servicers in the country.  (*See* Treasury's "*Servicer Performance Report Through December 2009*," attached to Declaration of Tim O'Brien in Support of Aurora Loan Services, LLC's Motion to Dismiss ("O'Brien Decl.") as Exhibit A.)  It has made modification offers on 34% of loans delinquent for more than sixty days.  (*Id*. at 5.)

Plaintiffs are homeowners whose loans were serviced by Aurora.  Each allege that Aurora ultimately denied their application for a HAMP loan modification.  Although not one of them even claims that he or she was ultimately qualified for a HAMP modification, plaintiffs allege that Aurora denied their applications without sufficient process.  They seek to have this Court impose fundamental changes in the operation of the HAMP program.  More specifically, under claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and denial of due process, plaintiffs request that the Court mandate enhanced forms of notice for HAMP denials and create a new administrative appeals process.

Two district courts have recently rejected each of the legal theories plaintiffs assert here. In *Escobedo v. Countrywide Home Loans, Inc.*, No. 09-cv-1557, 2009 U.S. Dist. LEXIS 117017, at *4 (S.D. Cal. Dec. 15, 2009), the court held that, as non-parties to the contract — known as the

Servicer Participation Agreement ("SPA") — the plaintiffs lacked standing to sue for breach of that agreement.  The result should be no different here.  Plaintiffs are not parties to the SPA, which was between Aurora and Fannie Mae acting as financial agent of the United States.  Moreover, the agreement in no way contemplated that non-party borrowers could sue to enforce it.  Under governing law, plaintiffs are presumed to be only incidental beneficiaries of the agreement.  *Id.* (citation omitted).  Plaintiffs' breach of contract claim thus fails as a matter of law and should be dismissed with prejudice.

Plaintiffs' due process claim fares no better.  In *Williams v. Geithner*, Civ. No. 09-1959, 2009 WL 3757380, at *7 (D. Minn. Nov. 9, 2009), the court rejected the very same due process claim alleged here, correctly concluding that the plaintiffs lacked a cognizable property interest in loan modifications.  As the court noted, both HAMP guidelines and the Servicer Participation Agreement, under which the loan servicers agree to participate in the program, afford servicers, who administer loans for the benefit of investors who own them, a great deal of discretion in deciding which loans to modify.  *Id.* at *6.  Servicers retain the discretion to "maximize their investments" and make loss-minimizing "determinations between modification or foreclosure." *Id.* at *7.  Moreover, servicers are not required to consider loan modifications where "prohibited by the rules of the applicable pooling and servicing agreement."  *Id.* at *2 (citation omitted).  In light of the voluntary and discretionary nature of extending modification offers, *Williams* concluded that "the HAMP does not provide Plaintiffs with a 'protected property interest,' the denial of which must comport with due process protections."  *Id.* at *7.  This conclusion was undeniably correct and mandates dismissal of the due process claim here.  Additionally, the due process claim also fails because Aurora is not a state actor and because the procedural protections already in place under HAMP are more than constitutionally sufficient.

Plaintiffs lack any legitimate legal basis upon which to ask this Court to supervise the administration of HAMP.  The Court should decline plaintiffs' invitation to legislate in an area entrusted to Congress and the Treasury.  Plaintiffs' breach of contract, implied covenant, and due process claims are without foundation and must be dismissed.

## FACTUAL BACKGROUND

**A.    The HAMP Program.**

On October 3, 2008, Congress enacted the Emergency Economic Stabilization Act of 2008 ("EESA"), Pub. L. No. 110-343, 122 Stat. 3765.  The Act allocated $700 billion to Treasury "to restore liquidity and stability to the financial system."  12 U.S.C. § 5201.  EESA's overall goals included "preserv[ing] homeownership" and "maximiz[ing] overall returns to the taxpayers of the United States."  12 U.S.C. § 5201(2).  Sections 109 and 110 of Title I of EESA provide, in relevant part:

> SEC. 109.  FORECLOSURE MITIGATION EFFORTS.
>
> (a) RESIDENTIAL MORTGAGE LOAN SERVICING STANDARDS.--*To the extent that the Secretary acquires mortgages*, mortgage backed securities, and other assets secured by residential real estate, including multifamily housing, the Secretary shall implement a plan that seeks to maximize assistance for homeowners and use the authority of the Secretary to encourage the servicers of the underlying mortgages, considering net present value to the taxpayer, to take advantage of the HOPE for Homeowners Program under section 257 of the National Housing Act or other available programs to minimize foreclosures.  In addition, the Secretary may use loan guarantees and credit enhancements to facilitate loan modifications to prevent avoidable foreclosures.
> . . .
> (c) CONSENT TO REASONABLE LOAN MODIFICATION REQUESTS.--Upon any request arising under existing investment contracts, the Secretary shall consent, where appropriate, and considering net present value to the taxpayer, to reasonable requests for loss mitigation measures, including term extensions,

rate reductions, principal write downs, increases in the proportion
of loans within a trust or other structure allowed to be modified, or
removal of other limitation on modifications.

SEC. 110.  ASSISTANCE TO HOMEOWNERS.
. . .
(b) HOMEOWNER ASSISTANCE BY AGENCIES.--

(1) IN GENERAL.--*To the extent that the Federal property
manager holds, owns, or controls mortgages*, mortgage backed
securities, and other assets secured by residential real estate,
including multifamily housing, the Federal property manager shall
implement a plan that seeks to maximize assistance for
homeowners and use its authority to encourage the servicers of the
underlying mortgages, and considering net present value to the
taxpayer, to take advantage of the HOPE for Homeowners
Program under section 257 of the National Housing Act or other
available programs to minimize foreclosures.

(Emphasis added.)

Armed with this authority, in February 2009, Treasury announced the Making Home

Affordable Program, of which HAMP—the subject of this lawsuit—is a part.  *See Williams*,

2009 WL 3757380, at *2.  HAMP works by providing financial incentives for borrowers,

servicers, and investors to enter into loan modifications, in situations where modifications make

economic sense for all parties.  (*See* Treasury Supplemental Directive ("S.D.") 09-01, attached to

O'Brien Decl. as Exhibit B.)[1]  HAMP accomplishes this objective by providing a semi-

standardized framework—the HAMP guidelines—under which lenders can compare the net

---

[1]  Although plaintiffs failed to attach the HAMP Guidelines or SPA to their complaint, they
reference the HAMP Guidelines throughout the complaint and allege that the HAMP Guidelines
are incorporated by reference into the SPA.  On a motion to dismiss, the Court may properly
consider a contract and other documents referred to in the complaint and central to the plaintiffs'
claim.  *See Manganaro Corp. v. Jefferson at Penn Quarter, L.P.*, Civ. No. 04-2133, 2005 U.S.
Dist. LEXIS 35714, at *2 n.3 (D.D.C. Aug. 8, 2005); *Vanover v. Hantman*, 77 F. Supp. 2d 91, 98
(D.D.C. 1999) (citation omitted).

present value of HAMP modified loans to the net present value of unmodified loans (i.e., loans that will likely proceed to foreclosure).  *Williams*, 2009 WL 3757380, at *6-7.

    For loans owned by Government-Sponsored Entities ("GSEs"), namely Fannie Mae and Freddie Mac, the HAMP guidelines went into immediate application, as they were automatically incorporated into the GSEs' agreements with their loan servicers.  (*See* Aurora's Servicer Participation Agreement at 1, attached to O'Brien Decl. as Exhibit C.)  For non-GSE-owned loans, however, like those at issue here, participation in HAMP is voluntary.  Servicers who choose to participate enter into contracts with the government—SPAs—under which they agree to participate in HAMP.  (*See* S.D. 09-01 at 1, attached to O'Brien Decl. as Exhibit B.)  The SPA expressly recognizes the fact that servicers do not hold the underlying right to retain principal and interest payments on the loans they administer.  Instead, in exchange for an administration fee, the servicers act as the agents of the investors who own the loans, collecting payments on the investors' behalf.  The servicers are bound by pre-existing agreements with the investors, specifying how they are to perform their administrative function.  In this regard, the SPA recognizes the servicer may be servicing mortgage loans for "the account of another party." (SPA at ¶ 2(A), attached to O'Brien Decl. as Exhibit C.)  The HAMP guidelines do not require servicers to consider loans for HAMP modification where "prohibited by the rules of the applicable PSA [pooling and servicing agreement] and/or other investor servicing agreements." (*See* S.D. 09-01 at 1, attached to O'Brien Decl. as Exhibit B; *see also* SPA at ¶ 2(B).)

    The HAMP guidelines specify threshold criteria to identify borrowers who *may* be eligible for loan modifications.  (*See id*. at 2-3.)  These include the following requirements, among others:

- the "mortgage loan is delinquent, or default is reasonably foreseeable";

- "the borrower has a monthly payment ratio of greater than 31 percent"; and

- the "loan is secured by a one- to four-unit property, one of which is the
  borrower's principal residence."

(*Id.*)  If the borrower satisfies the threshold criteria, then the guidelines enumerate a sequence of steps for servicers to apply ("Standard Modification Waterfall") to *evaluate* a hypothetical loan modification that would lower the borrower's payment to the "target monthly mortgage payment ratio" (i.e., no greater than 31% of the borrower's gross monthly income).  (*Id.* at 8.)  The Standard Modification Waterfall includes:  reduction of the interest rate in increments of .125% (to no less than 2%), extension of the term of the loan, and principal forbearance.  (*Id.* at 9-10.)  However, "[t]here is no requirement to forgive principal under the HAMP."  (*Id.* at 10.)  Thus, a potential modification can easily fail at the waterfall stage.  The borrower's income, for example, may be insufficient to bring the required payment down to the 31% of monthly income threshold, even after the Standard Modification Waterfall modifications are applied.  Simply put, many borrowers lack sufficient income to afford their homes, even under a modified loan.

It is important to bear in mind that the purpose of applying the Standard Modification Waterfall is to fashion a hypothetical modified loan that the servicer can use to conduct the net present value ("NPV") test, a "test that compares the NPV result for a modification to the NPV result for no modification."  (*Id.* at 4.)  "The NPV is essentially an accounting calculation to determine whether it is more profitable to modify the loan or allow the loan to go into foreclosure."  *Williams v. Geithner*, 2009 WL 3757380, at *3 n.3.  Servicers are permitted to "customize their own NPV model based on their individual portfolio experience."  (*See Treasury's "Base Net Present Value (NPV) Model Documentation"* Ver. 3.0, at 3, (Dec. 8, 2009) attached to O'Brien Decl. as Exhibit D.)

Servicers are not required to modify loans where doing so would be uneconomical and would increase either the risk or the severity of the loss to the investor.  A borrower must do more than meet HAMP's threshold eligibility criteria.  Only loans that produce a positive NPV under the NPV model are entitled to a trial modification.  (S.D. 09-01 at 4, attached to O'Brien Decl. as Exhibit B.)  "[A]lthough an applicant may be eligible [for a modification] in the sense of meeting the threshold criteria, servicers are not required to modify a loan with a negative NPV or if otherwise prohibited by the investor."  *Williams*, 2009 WL 3757380, at *3.

If the loan qualifies for a modification after application of *all* of the HAMP criteria, including the NPV test and any applicable investor agreement, then the loan is placed into a trial modification.  *Id.*; (Treasury's "*Base Net Present Value (NPV) Specifications*," at 1 (June 11, 2009), attached to O'Brien Decl. as Exhibit E.)  If the borrower remains current throughout the trial period, then the loan proceeds to a permanent modification.  (S.D. 09-01 at 17, attached to O'Brien Decl. as Exhibit B.)

In the roughly ten months that HAMP has been in effect, it has had a significant impact.  Participating servicers have extended offers on over 1,000,000 trial modifications; and over 900,000 trial modifications are already underway.  (*See* Treasury's "*Servicer Performance Report Through December 2009*" at 3, attached to O'Brien Decl. as Exhibit A.)  Aurora's contribution to this effort has been particularly strong.  It has placed roughly 34% of its 60+ day delinquent loans into either permanent or trial modifications.  (*Id.* at 4.)  Notwithstanding this progress, HAMP was never expected to prevent all foreclosures.  As President Obama himself has emphasized:  "This plan will not save every home."  (*See* http://www.whitehouse.gov/the_press_office/remarks-by-the-president-on-the-mortgage-crisis/; *see also* S.D. 09-08 at 1, attached to O'Brien Decl. as Exhibit F ("[T]here will be loans that

cannot be approved for a HAMP Trial Period Plan (Trial Period Plan) or official HAMP

modification[.]").)  "[L]oan modifications are not an entitlement, but are linked to decisions that

result in profits to taxpayers," servicers, and investors.  *Williams*, 2009 WL 3757380, at *6.

Since HAMP's inception, Treasury has been continually refining the program.  To this

end, on April 6, 2009, Treasury issued Supplemental Directive 09-01.  It has since issued

Supplemental Directives 09-02 through 09-10, the most recent of which on December 23, 2009.[2]

Supplemental Directive 09-08, issued on November 3, 2009, is of special significance to this

litigation.  It requires that borrowers who are deemed ineligible for HAMP modifications be

given written notice "of the reasoning for servicer determinations regarding program eligibility."

(S.D. 09-08 at 1, attached to O'Brien Decl. as Exhibit F.)  Additional procedural protections are

also in place.  For example, borrowers can contact the Treasury-endorsed Homeowner's HOPE

Hotline and speak with trained housing counselors about HAMP.  "If the counselor believes that

the borrower's application was improperly denied, the counselor can refer the concern to the

servicer's senior-level management.  If that senior-level official cannot resolve the issue, the

counselor can further escalate the case to a designated team at Fannie Mae whose responsibility

includes resolving individual and systemic problems."  *Williams*, 2009 WL 3757380, at *3.

Additionally, Treasury has instituted a "second look" process, administered by Freddie Mac,

under which Freddie Mac audits a sample of declined modification applications, to "minimize

the likelihood that borrower applications are overlooked or inadvertently denied."  *Id.*

---

[2] In recognition of the voluntary nature of the program, both the SPA and the guidelines permit servicers to opt-out with respect to future changes to the program.  (*See* SPA ¶ 10(C) attached to O'Brien Decl. as Exhibit C ("Participating Servicers will be afforded the opportunity to opt-out of a modified Program when Program Modifications are published[.]").)

### B.    Plaintiffs' Complaint

The complaint alleges that, "[o]n April 30, 2009, Aurora entered into a HAMP Contract as a Participating Servicer [i.e., SPA]."  (Compl. ¶ 4.)  Plaintiffs are the owners of four properties in New York.  They allege that they were denied loan modifications by Aurora, which services their loans.  (*Id.* ¶ 5.) Although each plaintiff alleges that he or she "meets the minimum criteria to be considered for HAMP modification" (Compl. ¶¶ 61, 72, 89, 103), none of the plaintiffs alleges that he or she would have ultimately qualified for a HAMP modification.  Instead, the complaint is based on the assertion that Aurora "wrongfully denied Plaintiffs access to the benefits of HAMP by refusing to evaluate their non-GSE loans for modification."  (Compl. ¶ 6.)  The complaint further alleges that, after consideration of each plaintiff's modification request, Aurora informed each plaintiff that his or her loan did "not qualify for HAMP" because the "loan is investor-owned."  (Compl. ¶¶ 71, 87, 101, 111.)  This reason for denial, however, is expressly permitted both by the SPA and by HAMP guidelines.  (SPA at ¶ 2(B), attached to O'Brien Decl. as Exhibit C; S.D. 09-01 at 1, attached to O'Brien Decl. as Exhibit B.)

Notwithstanding the fact that none of the plaintiffs are parties to the SPA, the complaint purports to bring claims for: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; and (3) violation of due process.  In addition to Aurora, plaintiffs' complaint names Timothy Geithner, in his capacity as Secretary of the Treasury; Henry Allison, Jr., in his capacity as Assistant Secretary for Financial Stability; Edward DeMarco, in his capacity as Acting Director, Federal Housing Finance Agency; Federal National Mortgage Association; Michael J. Williams, in his capacity as President and Chief Executive Officer, Federal National Mortgage Association; and Eric Schuppenhauer, in his capacity as Senior Vice

President, Federal National Mortgage Association, as defendants.  Each of Plaintiffs' claims is pled against Aurora.  Only the due process claim is pled against the other defendants.

### MOTION TO DISMISS STANDARD

In two landmark decisions, the Supreme Court has recently clarified that to satisfy Rule 8 of the Federal Rules of Civil Procedure, and thus survive a motion under Rule 12(b)(6), a complaint must allege actual facts—not mere legal conclusions masquerading as facts—demonstrating a *plausible* claim for relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, -- U.S. ---, 129 S. Ct. 1937 (2009).  In *Twombly* and *Iqbal*, the Supreme Court disapproved the interpretation of Rule 8 used by federal courts for over fifty years, derived from *Conley v. Gibson*, 355 U.S. 41 (1957), under which a complaint needed only to set forth a "short and plain statement of the claim" to give a defendant "fair notice" of the plaintiff's claim. *Twombly*, 550 U.S. at 555.  Under the old, *Conley* standard, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  355 U.S. at 45-46. *Twombly* rejected *Conley*'s "no set of facts" language as a "phrase [] best forgotten as an incomplete, negative gloss on an accepted pleading standard."  550 U.S. at 563.

In *Conley*'s place, *Twombly* and *Iqbal* now require a two-step analysis.  *Iqbal*, 129 S. Ct. at 1949.  *First*, a court must consider only the factual allegations of the complaint—neither its legal conclusions nor its bare recitation of the elements of a claim—in determining whether the plaintiff has made a plain statement of the grounds of her entitlement to relief.  Fed. R. Civ. P. 8(a); *Twombly*, 550 U.S. at 555 (providing that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do"); *Iqbal*, 129 S. Ct. at 1949 (Rule 8

"demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"). The

facts pleaded must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at

555. Furthermore, the court is "not bound to accept as true legal conclusions couched as a

factual allegation." *McAdams v. McCord*, 584 F.3d 1111 (8th Cir. 2009) (quoting *Iqbal*, 129

S. Ct. at 1949 ("the tenet that a court must accept as true all of the allegations contained in a

complaint is inapplicable to legal conclusions")). Legal conclusions are thus properly

disregarded. *Iqbal*, 129 S. Ct. at 1950-51. *Second*, if the plaintiff has alleged sufficient facts to

bear out the elements of the claim, the court must then consider whether the adequately pleaded

facts state a "plausible," rather than a merely "possible," claim. *Twombly*, 550 U.S. at 555;

*Iqbal*, 129 S. Ct. at 1950.

      In *Twombly* and *Iqbal*, the Court explained its construction of Rule 8 by reference to the

burdens and pressures that litigation imposes on a party defendant once the plaintiff is held to

have stated a claim. In *Twombly*, the Court explained that "something beyond the mere

possibility of loss causation must be alleged, lest a plaintiff with a 'largely groundless claim' be

allowed to 'take up the time of a number of other people, with the right to do so representing an

*in terrorem* increment of the settlement value.'" 550 U.S. at 557-58 (quoting *Dura Pharms.*,

*Inc. v. Brudo*, 544 U.S. 336, 347 (2005)). The "time" of the defendant "take[n] up" translates to

discovery cost. The Court noted that "discovery accounts for as much as 90 percent of litigation

costs when discovery is actively employed." *Id.* at 558-59 (citation omitted). The Court rejected

the argument, made in the dissent, that discovery abuse can be effectively addressed by careful

case management, by scrutiny at the summary judgment stage, or by instructions to juries. *Id.* at

559-60 & n.6. The Court observed that "the threat of discovery expense will push cost-

conscious defendants to settle even anemic cases before reaching [summary judgment or trial]."

*Id.* at 559.

## ARGUMENT

I. **PLAINTIFFS' BREACH OF CONTRACT CLAIM FAILS BECAUSE THEY ARE NOT PARTIES TO THE CONTRACT AND LACK STANDING TO ENFORCE IT.**

Plaintiffs lack standing to sue for an alleged breach of the SPA.  Plaintiffs are not parties to the SPA, nor are they intended third-party beneficiaries.  As such, plaintiffs do not have enforceable rights under the contract, and their breach of contract claim must be dismissed.

### A. **Plaintiffs Are Not Intended Third-Party Beneficiaries Under the SPA.**

In a nearly identical breach of contract action against Countrywide, involving the identical form SPA, the United States District Court for the Southern District of California recently held that the "Plaintiff lacks standing to sue because he is not an intended third-party beneficiary" of the SPA, and granted Countrywide's motion to dismiss the breach of contract claim.  *Escobedo v. Countrywide Home Loans, Inc.*, No. 09-cv-1557, 2009 U.S. Dist. LEXIS 117017, at *4 (S.D. Cal. Dec. 15, 2009).  The court correctly reasoned that "[a] qualified borrower would not be reasonable in relying on the Agreement as manifesting an intention to confer a right on him or her [.]"  *Id.* at *6.  "The Agreement sets forth Home Affordable Modification Program *Guidelines,*" which "set forth eligibility requirements and state: 'Participating servicers are required to *consider* all eligible loans under the program guidelines unless prohibited by the rules of the applicable PSA and/or other investor servicing agreements.'"  *Id.* (italics in original; citation omitted).  The court concluded that the SPA "does not state that Countrywide must modify all mortgages that meet the [threshold] eligibility requirements" and that the plaintiffs lacked standing to enforce the SPA.  *Id.* at *6-7.

Accordingly, the court held that qualified borrowers are incidental beneficiaries without enforceable rights under the HAMP contract and lack standing to sue for an alleged breach of the contract. *Id.* at *7. The *Escobedo* court's conclusion was correct and should be adopted here.

The SPA is governed by federal law. (*See* SPA § 11A, attached to O'Brien Decl. as Exhibit C.)[3] Under federal law, "[b]efore a third party can recover under a contract, it must show that the contract was made for its direct benefit – that it is an *intended beneficiary* of the contract." *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 2000) (emphasis added; citation omitted); *see also Glass v. United States*, 258 F.3d 1349, 1354 (Fed. Cir. 2001) (Plaintiff must "at least show that [the contract] was intended for his *direct* benefit") (emphasis in original). It is insufficient that the agreement was entered into with the putative beneficiary "in mind." *Klamath*, 204 F.3d at 1211-12. Instead, to be deemed an intended beneficiary, the language of the contract must show that "the parties intended to grant [the third party] the right to enforce the Agreement." *Escobedo*, 2009 U.S. Dist. LEXIS 117017, at *6; *see also SEC v. Prudential Securities, Inc.*, 136 F.3d 153 (D.C. Cir. 1998) (concluding that third party needed to demonstrate that the contracting parties to a consent decree intended to allow the third party to enforce the terms of the agreement in court).

No such language is present in the SPA. On the contrary, the SPA specifically identifies the contemplated beneficiaries of the agreement, a recitation that does not include plaintiffs. (*See* SPA ¶ 11(E) attached to O'Brien Decl. as Exhibit C ("The Agreement shall inure to the

---

[3] Although plaintiffs failed to attach the SPA to the complaint, on a motion to dismiss, the Court may properly consider a contract referred to in the complaint and central to the plaintiffs' claim. *See Manganaro Corp.*, 2005 U.S. Dist. LEXIS 35714, at *2 n.3; *Vanover*, 77 F. Supp. 2d at 98 (citation omitted).

benefit of . . . the parties to the Agreement and their permitted successors-in-interest.").) *See also Escobedo*, 2009 U.S. Dist. LEXIS 117017, at *6 (concluding that although the HAMP contract "was entered into in part for the benefit of qualified borrowers and with these borrowers in mind . . . the language of the contract does not show that the parties intended to grant qualified borrowers the right to enforce the Agreement").

In ascertaining whether parties to a contract intended to benefit a third party, courts also "ask whether the beneficiary would be reasonable in relying on the promise as manifesting an intention to confer a right on him or her." *Id.* at 1211 (citing Restatement (Second) Contracts § 302(1)(b) cmt. d). A borrower would not be reasonable in relying on the SPA to confer a right on him or her here. As the *Escobedo* court noted, the SPA does not require that Aurora modify any particular loans, and plaintiffs do not even allege that their loans ultimately qualified for modification. Instead, like other servicers that entered into SPAs, Aurora retained considerable discretion over which loans it would modify. *See Williams*, 2009 WL 3757380, at *6 (noting that servicers retain "broad discretion" over the "calculation of the NPV," which drives which loans are modified). The SPA expressly recognizes that investors have the right to refuse modification of their loans. (SPA ¶ 2(A)-(B) attached to O'Brien Decl. as Exhibit C.) Not only did Congress choose to make "servicer participation [in HAMP] voluntary, but [it] also afforded to program participants discretion on several variables that impact the NPV determination." *Id.* at *7. In light of the foregoing, plaintiffs could not have reasonably relied on the SPA as granting *them* the *right* to a loan modification. As such, they lack standing to enforce the SPA. *Escobedo*, 2009 U.S. Dist. LEXIS 117017, at *6 ("A qualified borrower would not be reasonable in relying on the Agreement as manifesting an intention to confer a right on him or her[.]").

14

### B.     Plaintiffs Are Presumed To Be Incidental Beneficiaries.

Accordingly to plaintiffs' own allegations, the SPA is a government contract, as it was entered into by "Aurora and *the United States* (through Fannie Mae acting as financial Agent of the United States)."  (Compl. ¶ 159 (emphasis added).)  "Parties that benefit from a government contract are generally assumed to be incidental beneficiaries," rather than intended ones, and "may not enforce the contract absent a *clear intent* to the contrary."  *Klamath*, 204 F.3d at 1211 (citing Restatement (Second) Contracts § 313(2)) (emphasis added).  "Government contracts often benefit the public, but individual members of the public are treated as incidental beneficiaries unless a different intention is manifested."  *Id.* (citation omitted).

The "clear intent" hurdle is not easily met, and definitely not met here.  The hurdle is not satisfied by a contract's recitation of interested constituencies, *Klamath*, 204 F.3d at 1212, "[v]ague, hortatory pronouncements," *id.*, "statement[s] of purpose," *Smith v. Cent. Ariz. Water Conservation Dist.*, 418 F.3d 1028, 1037 (9th Cir. 2005), "explicit reference to a third party," *Orff v. United States*, 358 F.3d 1137, 1145 (9th Cir. 2004), or even a showing that the contract "operates to the [third party's] benefit and was entered into with [him] in 'mind.'"  *Id* at 1147. Rather, courts examine the "precise language of the contract for a 'clear intent' to rebut the presumption that the [third parties] are merely incidental beneficiaries."  *Id*.

While there is no doubt that the SPA was entered into with certain qualified borrowers in mind, nothing in the contract remotely evidences an intent to grant putative HAMP applicants the right to enforce the contract.  On the contrary, the only beneficiaries the contract recognizes are "the parties to the Agreement."  (SPA ¶ 11(E), attached to O'Brien Decl. as Exhibit C.) Plaintiffs cannot overcome the strong presumption that they are incidental beneficiaries, without standing to enforce the contract.

### C.    The Parties to the HAMP Contract Did Not Intend to Expose Themselves to Potentially Millions of Lawsuits.

Courts also consider the number of potential third-party beneficiaries to determine whether the parties to the contract actually intended to allow third parties to enforce the contract. *See, e.g.*, *Price v. Pierce*, 823 F.2d 1114, 1121 (7th Cir. 1987) (noting, in the context of contracts between developers and state housing agencies, that the parties would likely not have intended that "almost every lower-income person in the United States" be able to enforce the contract). Here, neither Fannie Mae nor the contracting loan servicers, like Aurora, intended to expose themselves to suit by the millions of borrowers who have sought and will seek HAMP modifications.  (*See* Compl. ¶ 26 (reflecting that the number of HAMP applicants will be in the millions).)  Under plaintiffs' standing argument, the standing of taxpayers to enforce the SPA would also have to be recognized, as both the EESA and HAMP were enacted to benefit them, as well.  *See* 12 U.S.C. § 5201(2); Treasury's "*Base Net Present Value Model Documentation*" ver. 3.0 (Dec. 8, 2009), attached to O'Brien Decl. as Exhibit D.

Nothing in the SPA here demonstrates an intent of the contracting parties to expose themselves to such an enormous number of potential lawsuits.  On the contrary, the agreement demonstrates that the parties wanted to *limit* their exposure to litigation.  To that end, the SPA sets forth a dispute resolution procedure, which includes the parties' agreement to "take all reasonable steps to resolve disputes internally before commencing legal proceedings."  (SPA ¶ 7, attached to O'Brien Decl. as Exhibit C.)  The parties noted that it is "in their mutual interest to resolve disputes by agreement."  *Id*.  This language confirms the parties' desire to limit their exposure to lawsuits, and is further evidence that they did not intend to give borrowers the right to sue them under the SPA.

**D.     Plaintiffs' Complaint Does Not Demonstrate That Their Intended Beneficiary Theory Is Plausible.**

Although plaintiffs' complaint summarily concludes that plaintiffs are "intended third-party beneficiaries under the HAMP Contract" (Compl. ¶ 160), none of the factual allegations therein demonstrate that this legal conclusion is plausible.  Under the Supreme Court's recent decisions in *Twombly* and *Iqbal*, to survive a motion to dismiss, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'" *Iqbal*, 129 S. Ct. at 1949 (emphasis added).  In breach of contract cases brought by third parties, the plausibility standard requires the complaint to plead facts sufficient to show that it is plausible, not just possible, that the parties to the contract actually intended to vest the plaintiff with intended beneficiary status.  *See, e.g.*, *Davis Moreno Constr., Inc. v. Frontier Steel Bldgs. Corp.*, No. CV-F-08-854, 2009 U.S. Dist. LEXIS 104256, at *13, *15-16 (E.D. Cal. Nov. 9, 2009) (dismissing complaint, pursuant to *Iqbal*, that failed to plead plausible facts sufficient to show that plaintiff was an intended third-party beneficiary); *Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC*, 637 F. Supp. 2d 185, 198, 201 (S.D.N.Y. 2009) (dismissing third-party beneficiary claim for failing to meet plausibility standard).

Here, the complaint is bereft of factual allegations demonstrating the plausibility of plaintiffs' intended beneficiary theory.  Instead, the complaint merely contains unsupported legal conclusions, such as:

- "Plaintiffs and all class members are intended third-party beneficiaries under the HAMP Contract."  (Compl. ¶ 160.)

- "The central purpose of HAMP and the HAMP Contract is to ensure that borrowers whose loans are serviced by Aurora and who potentially are eligible for loan modifications under HAMP are properly considered for modification[.]"  (Compl. ¶ 162.)

These are precisely the types of conclusory statements that the Supreme Court has said are no longer sufficient to survive a motion to dismiss. *Twombly*, 550 U.S. at 555.

Plaintiffs cite several sections of the HAMP guidelines and the SPA that they claim benefit homeowners. (Complaint ¶¶ 42-49.) But, both invest broad discretion in the servicers to determine eligibility based on the NPV test and investor guidance. Simply referencing these provisions shows, at best, that homeowners are incidental beneficiaries of the contract between Aurora and Fannie Mae. *See* Restatement (Second) of Contracts § 313 cmt. a ("Government contracts often benefit the public, but individual members of the public are treated as incidental beneficiaries unless a different intention is manifested."). These provisions do not show that the contracting parties intended to bestow borrowers with the right to sue to enforce the contract. As set forth above, other provisions of the SPA plainly evidence an intent to limit the right to sue under the contract to the contracting parties. *See* SPA ¶¶ 7, 11(E), attached to O'Brien Decl. Exhibit C.

### E.   Plaintiffs' Contract Claim Is a Specious Attempt to Create a Private Right of Action Under EESA, Where None Exists.

Plaintiffs' breach of contract claim should also be rejected as an unauthorized attempt to end-run around EESA's remedial scheme. Congress did not create a private right of action against loan servicers under EESA, and plaintiffs should not be able to circumvent Congress's decision under the guise of a breach of contract label. EESA's statutory language unambiguously denies the right of action that plaintiffs seek to assert in this case. *See* 12 U.S.C. § 5229. The only private right of action that EESA creates is for individuals to bring an action under the Administrative Procedures Act ("APA") to challenge actions taken by the Secretary. The relevant provisions of Section 5229 state as follows:

      (a)       Judicial review.

         (1)      Standard. Actions by the Secretary pursuant to the authority of this Act shall be subject to chapter 7 of title 5, United States Code [APA, 5 U.S.C.S. §§ 701 et seq.] including that such final actions shall be held unlawful and set aside if found to be arbitrary, capricious, an abuse of discretion, or not in accordance with law.

         (2)      Limitations on equitable relief.

            (A)      Injunction. No injunction or other form of equitable relief shall be issued against the Secretary for actions pursuant to . . . [12 U.S.C.S. § 5211, 5212, 5216, and 5219], other than to remedy a violation of the Constitution.

*Id.* The statute does not recognize any right of action against voluntary participants, such as private loan servicers like Aurora. Similarly, there is no private cause of action under HAMP. *See, e.g., Gaitan v. Mortg. Elec. Registration Sys.*, No. 09-cv-1009, 2009 U.S. Dist. LEXIS 97117, at *38 (C.D. Cal. Oct. 5, 2009) (concluding that HAMP does not provide a private cause of action and dismissing claim).

    Congress did provide an alternative to private lawsuits as a check on the Secretary's implementation of EESA. Specifically, Congress enacted multiple layers of oversight to ensure that EESA achieved its intended purpose. For example, EESA established the Financial Stability Oversight Board and the Congressional Oversight Panel, which are charged with reviewing the Secretary's actions, making recommendations to the Secretary, and reporting back to Congress. 12 U.S.C. §§ 5214, 5233. In addition, the Comptroller General has oversight responsibilities for several aspects of TARP, including the Secretary's performance in mitigating foreclosures. *See* 12 U.S.C. § 5226(a)(1)(A)(i).

    Thus, Congress has already designed an administrative and legislative system that can respond to any alleged inadequacies in HAMP, including those alleged by plaintiffs. It would be

contrary to the legislative scheme to recognize an additional, non-statutory cause of action against Aurora.  *See, e.g.*, *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 83-84, 86 (2d Cir. 2003) (dismissing employees' third-party beneficiary breach of contract claim for unpaid wages as improper "indirect attempts at privately enforcing the prevailing wage schedules contained in the [Davis-Bacon Act]").

For all these reasons, plaintiffs' breach of contract claim is defective and should be dismissed.

## II.  PLAINTIFFS' CLAIMS ALSO FAIL BECAUSE THEY DO NOT ALLEGE INJURY AND THUS LACK STANDING TO PROSECUTE THE CLAIMS.

Plaintiffs each allege that they meet the threshold eligibility requirements for a HAMP modification, (*see* Compl. ¶¶ 61, 72, 89, 103), and that they each applied for a modification. (*See* Compl. ¶¶ 62, 73, 90, 104).  However, plaintiffs fail to allege that they would meet Aurora's net present value analysis, which is a prerequisite to any HAMP modification.  Plaintiffs' failure to plead that, in the absence of the allegedly unlawful conduct, they would have received loan modifications is fatal to their claims, and therefore, plaintiffs lack standing to pursue them.  The alleged lack of due process does not qualify as an "injury-in-fact" that is "fairly trace[able]" to the actions of Aurora which can be "redressed by a favorable decision," of this court by enjoining foreclosures.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (citation omitted).

Moreover, as a practical matter, plaintiffs' due process claims have been rendered moot in light of the Treasury's recent issuance of Supplemental Directive 09-08, which requires all HAMP servicers to send detailed, written notices to HAMP applicants who are denied a modification, with the specific reason(s) for denial.  Article III of the Constitution requires that

courts only adjudicate actual, ongoing cases or controversies to ensure that "self-interested

parties vigorously advocating opposing positions" present issues "in a concrete factual setting."

*United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 403 (1980) (citation omitted).

## III.   PLAINTIFFS' CLAIM FOR BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING FAILS FOR THE SAME REASONS THAT THE BREACH OF CONTRACT CLAIM FAILS.

Plaintiffs' claim for breach of the covenant of good faith and fair dealing fails for the

same reasons that their breach of contract claim fails.  "The covenant of good faith and fair

dealing is an implied duty that each party to a contract *owes its contracting partner.*"  *Centex

Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005) (emphasis added).  As set forth

above, plaintiffs are neither parties to the SPA nor intended beneficiaries thereunder.  As such,

Aurora does not owe them any duties under the implied covenant.

Moreover, "the implied covenant of good faith and fair dealing cannot be used to expand

a party's contractual duties beyond those in its express contract."  *Id*. at 1306.  Although

plaintiffs allege that Aurora breached the implied covenant by failing to provide them with a

detailed explanation of why they were denied loan modifications and failing to provide them

with a procedure to challenge Aurora's decision (Compl. ¶ 184), the SPA imposed no duty on

Aurora to provide these things.[4]  Plaintiffs cannot use the implied covenant to create a

contractual duty that does not otherwise exist.  The implied covenant claim fails as a matter of

law and should be dismissed.

---

[4]  Regardless, plaintiffs' demand for a detailed explanation of any denial has been rendered moot in light of the Treasury's intervening Supplemental Directive 09-08 which requires all HAMP servicers to send detailed, written notices to HAMP applicants who are denied a modification with the specific reason(s) for denial.

IV.    **PLAINTIFFS' DUE PROCESS CLAIM FAILS BECAUSE PLAINTIFFS LACK A COGNIZABLE PROPERTY INTEREST.**

Plaintiffs' due process claim also fails because neither EESA, nor HAMP guidelines, nor the SPA vests borrowers with any cognizable property interest in a loan modification.  Indeed, the United States District Court for the District of Minnesota recently rejected due process claims identical to those raised by plaintiffs here, concluding:

> Plaintiffs do not have a legitimate claim of entitlement to a loan modification.  Thus, the HAMP does not provide Plaintiffs with a "protected property interest," the denial of which must comport with due process.

*Williams*, 2009 WL 3757380, at *7.  The due process claim fares no better here.

A.    **Neither EESA, nor HAMP Guidelines, nor the SPA Gives Rise to a Protected Property Interest.**

The Supreme Court has made it clear that for a government benefit to give rise to a protected property interest, "a person clearly must have more than an abstract need or desire [or] a unilateral expectation" of receiving the particular benefit.  *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). "He must, instead, have a *legitimate claim of entitlement* to it." *Id.* (emphasis added).

Here, EESA itself precludes a finding of entitlement to loan modifications because, rather than *requiring* mandatory modifications, the statute only "encourage[s]" servicers to modify mortgages, providing that the Secretary should "*encourage* the servicers of the underlying mortgages . . . to take advantage of . . . available programs to minimize foreclosures."  12 U.S.C. § 5219(a)(1) (emphasis added).  Continuing the permissive theme, EESA goes on to provide that "the Secretary *may* use loan guarantees and credit enhancements to facilitate loan modifications to prevent *avoidable* foreclosures." *Id.* (emphasis added).  Nothing in EESA requires servicers to modify mortgages in every instance; nor does it require servicers to cease all foreclosures.

Moreover, as the *Williams* court found, EESA "does not create an absolute duty on the part of the Secretary to consent to loan modifications;" rather, "the statute provides that loans may be modified 'where appropriate' — a phrase that limits the Secretary's obligation and evinces a Congressional intent to afford discretion in the decision whether to modify loans in certain circumstances."  2009 WL 3757380, at *6.

As the court in *Williams* also noted, "statements by members of Congress who felt that the HAMP did not go far enough underscore this point."  2009 WL 3757380 at *6 n.5.  *See, e.g.*, 154 Cong. Rec. H10778 (daily ed. Oct. 3, 2008) (statement of Rep. Jackson-Lee) ("[I]n section 109, which addresses 'foreclosure mitigation efforts,' the language should be changed from 'shall encourage' to 'shall require' to provide stronger relief for Americans"); 154 Cong. Rec. H10766 (daily ed. Oct. 3, 2008) (statement of Rep. Kucinich) ("The central flaw of this bill is that there are no stronger protections for homeowners and no changes in the language to ensure that the secretary has the authority to compel mortgage servicers to modify the terms of mortgages . . . .We could have demanded language in the legislation that would have empowered the Treasury to compel mortgage servicers to rework the terms of mortgage loans[.]"); 154 Cong. Rec. H10791 (daily ed. Oct. 3, 2008) (statement of Rep. Udall) ("I believe we could have added provisions that . . . required the government to help responsible homeowners refinance their mortgages . . . .").

The fact that participation in the HAMP program is voluntary (S.D. 09-01 at 1, attached to O'Brien Decl. as Exhibit B) and conditions eligibility for a modification on so many complex factors ("*Base Net Present Value (NPV) Model Documentation,*" attached to O'Brien Decl. as Exhibit D), as well as the discretion afforded to servicers, such as Aurora, further rebuts plaintiffs' claim of a protectable property interest.  The Due Process Clause protects only those

interests "upon which people rely in their daily lives." *Roth*, 408 U.S. at 577.  No legitimate

reliance interest exists where the alleged "property interest" is merely a subjective hope of

obtaining a prospective advantage that is uncertain, conditioned on the satisfaction of many

complex determinations or at the discretion of third parties.  *See, e.g., Reed v. Village of

Shorewood*, 704 F.2d 943, 948 (7th Cir. 1983) (defining property as "what is securely and

durably yours under state (or . . . federal) law, as distinct from what you hold subject to so many

conditions as to make your interest meager, transitory, or uncertain").

 While the HAMP guidelines set forth threshold eligibility criteria (on which plaintiffs

heavily rely), whether any modification will ultimately be approved depends on each individual

mortgage servicer's evaluation of whether the modification would maximize the NPV (or,

alternatively stated, minimizes losses) to the owner of the loan ("*Base Net Present Value (NPV)

Model Documentation,*" attached to O'Brien Decl. as Exhibit D), in addition to whether the

investor servicing agreement permits modifications, if the loan is investor-owned (S.D. 09-01 at

1, attached to O'Brien Decl. as Exhibit B).  Even accepting as true plaintiffs' allegations that

they meet the threshold eligibility criteria necessary to obtain a HAMP modification, they ignore

the flexibility afforded to servicers in the NPV evaluations and that actual approval of a

particular loan modification involves a significant amount of discretion.[5]  Treasury guidelines

make this point explicitly clear:

> Individual servicers have their own unique experience with the
> loans they service.  The program permits servicers to customize the
> base NPV model to reflect their unique experience, within certain
> constraints and guidelines.  As a result of customization, servicer

---

[5]  (*See* Treasury's "*Home Affordable Modification Program Guidelines*" (March 4, 2009) at 6, attached to O'Brien Decl. as Exhibit G.)

> NPV results and resulting modification decisions will likely vary
> even when borrowers' circumstances appear to be similar, but the
> results will be more accurate and prove a better gauge of
> appropriate modifications.[6]

Thus, mortgage servicers, such as Aurora, retain the discretion to determine (according to their

own customized NPV analyses) whether an applicant qualifies for a loan modification under

HAMP.  As the *Williams* court concluded, HAMP regulations "clearly demonstrate that the

Secretary allowed the exercise of some discretion, including calculation of the NPV, to the

servicers."  2009 WL 3757380, at *6.

Moreover, nothing in the SPA limits the discretion provided for in the HAMP

regulations.  Rather, the SPA explicitly adopts the flexibility the HAMP regulations allow.  (*See*,

*e.g.*, SPA §§ 1(A), 2(B), 10(C), attached to O'Brien Decl. as Exhibit C.)  Even though this

discretion is not "unfettered," it is sufficient to make any claim of entitlement by plaintiffs too

uncertain to qualify for protection under the Due Process Clause.  *Williams*, 2009 WL 3757380,

at *6.

**B.**     **Plaintiffs' Status As Mere Applicants for Loan Modifications Further Undermines Their Due Process Claim.**

Plaintiffs' due process claim is further doomed by their status as mere applicants for loan

modifications.  The Supreme Court has drawn a distinction, for due process purposes, between

those who have received government benefits and may have a "legitimate claim of entitlement,"

and those who have merely applied for benefits and do not have such a claim.  *See Lyng v.Payne*,

476 U.S. 926, 942 (1986) (noting that the Supreme Court has "never held that applicants for

benefits, as distinct from those already receiving them, have a legitimate claim of entitlement

---

[6]  (Treasury's "*Base Net Present Value Model Specifications*" (June 11, 2009) at 3, attached to O'Brien Decl. as Exhibit E.)

protected by the Due Process Clause"); *see also* RONALD B. ROTUNDA & JOHN E. NOWAK,

*Treatise on Constitutional Law*, § 17.5(c) at 109 (4th ed.) ("a person has no property interest in a

benefit unless he has previously been granted it by the government").  This confirms that

plaintiffs cannot proceed with their due process claim.

In *Lyng*, the Supreme Court reviewed the sufficiency of notice provisions contained in a

federal loan program.  476 U.S. 926.  There, the plaintiffs claimed that the Secretary of

Agriculture's failure to provide better notice of the program resulted in numerous eligible

farmers missing their opportunity to obtain loan benefits, allegedly in violation of their due

process rights.  The Supreme Court held that no due process claim would lie, in part because the

plaintiffs' status as mere potential applicants — even if they met the eligibility requirements for

the loan program — did not give them a property interest subject to due process protections.  *Id.*

at 932, 942-43.  Plaintiffs here, who have merely applied for HAMP modifications, do not have

an actionable due process claim under *Lyng*.

## V. PLAINTIFFS' DUE PROCESS CLAIM ALSO FAILS BECAUSE AURORA IS NOT A GOVERNMENT ACTOR.

Plaintiffs' due process ambitions falter as well on the Fifth Amendment's requirement of

state action.  *See Am. Mut. Mfrs. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (holding "the party

charged with the deprivation must be a person who may fairly be said to be a state actor"); *see*

*also Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 191-95 (1988) (holding that no

due process claim could be stated against the NCAA because it was not a state actor).  Aurora is

not a state actor, and plaintiffs' due process claim must thus be dismissed.

The complaint acknowledges that Aurora is a private actor, but then claims that Aurora's

participation in HAMP is so intertwined with requirements imposed by the government that

Aurora is acting "under color of federal law."  (Compl. ¶ 121.)  But, even when private companies are extensively regulated and operating under government programs, they are not deemed government actors for due process purposes.  *See Sullivan*, 526 U.S. at 52 ("In cases involving extensive state regulation of private activity, we have consistently held that the 'mere fact that a business is subject to state regulation does not by itself convert its action into that of the State'") (citation omitted); *see also Rank v. Nimmo*, 677 F.2d 692, 702 (9th Cir. 1982) ("foreclosure by a private lender of a mortgage in a federal mortgage guaranty program does not involve federal action sufficient to invoke the due process clause of the Fifth Amendment"). Aurora's decision not to approve plaintiffs' modification applications was its own, and thus one made by a private actor.

Contractual relationships with the government are also insufficient to transform private actors into state actors for constitutional purposes.  *See Rendell-Baker v. Kohn*, 457 U.S. 830, 843 (1982) (concluding that a "school's fiscal relationship with the State is not different from that of many contractors performing services for the government" where state action is not found); *Spark v. Catholic University*, 510 F.2d 1277 (D.C. Cir. 1975) (concluding that receipt of government aid to a private college through governmental contracts did not amount to state action).  *See also Warren v. Gov't Nat'l Mortgage Ass'n*, 611 F.2d 1229, 1233 (8th Cir. 1980) (holding that no state action was present where the due process claims stemmed from a home foreclosure by the Government National Mortgage Association, an entity that was "wholly-owned by the federal government" and that operated "under federal government authority").

In sum, Aurora is a private party, and thus its actions as a loan servicer fall outside the reach of the Due Process Clause.[7]  Plaintiffs' conclusory assertions to the contrary are simply not plausible and certainly not supported by any alleged facts.

## VI.   THE PROCEDURAL PROTECTIONS ALREADY IN PLACE SATISFY DUE PROCESS UNDER *MATHEWS*.

Assuming, *arguendo*, that plaintiffs' had cognizable property interests, and that Aurora were a state actor, plaintiffs' due process claims would still fail because the HAMP procedures established by Treasury are more than constitutionally sufficient.  The Supreme Court has established three factors to be used to adjudicate the sufficiency of process under the Due Process Clause:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).  Notably, the requirements of due process are "flexible and call[] for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

Plaintiffs cannot establish that the additional process they are demanding — namely, detailed notice of the basis for the decisions and an opportunity to appeal — is required under

---

[7] Any reliance by plaintiffs on *Huxtable v. Geithner*, No. 09-cv-1846, 2009 U.S. Dist. LEXIS 119418 (S.D. Cal. Dec. 23, 2009), is misplaced.  In that case, the court erroneously declined to dismiss a HAMP due process claim, while acknowledging that "[t]he Court does not have sufficient facts before it to determine whether state action exists here."  *Id*. at *6-7. Under the pleading standards articulated in *Twombly* and *Iqbal*, if the plaintiff failed to sufficiently plead facts demonstrating plausible state action, the complaint should have been dismissed.

*Mathews*.  (*See, e.g.*, Compl. ¶¶ 9, 170, 171.)  The procedures already in place under HAMP to protect against an erroneous decision are sufficient as a matter of law.

With respect to plaintiffs' demand for a written notice of "the reasons for [modification denials] with sufficient detail to enable the mortgagor to determine whether the decision is correct," written notice is already required under the HAMP guidelines.  (Compl. ¶ 163(d).)  On November 3, 2009,[8] Treasury issued Supplemental Directive 09-08, concerning the format, content, and timing of written notices that must now be provided to borrowers who were evaluated for HAMP modification, but not ultimately approved.  (*See* S.D. 09-08, attached to O'Brien Decl. as Exhibit F.)  Treasury has specified that the notices must include the primary reason or reasons for denial and other foreclosure alternatives for which the borrower may be eligible, among other things.  (*Id.*)  Supplemental Directive 09-08 went into effect on January 1, 2010.  (*Id.*) To the extent that Plaintiffs are demanding that the notices contain additional details, they are merely articulating a policy disagreement with the Treasury that would be more appropriately addressed to the agency, rather than to this Court.

In addition to the notice requirement, there are a number of other procedural protections in place under HAMP.  As the *Williams* court noted:

> [B]orrowers denied a loan modification can contact the Homeowner's HOPE Hotline and speak with a trained housing counselor regarding the HAMP program.  If the counselor believes that the borrower's application was improperly denied, the counselor can refer the concern to the servicer's senior-level management.  If that senior-level official cannot resolve the issue, the counselor can further escalate the case to a designated team at Fannie Mae whose responsibility includes resolving individual and

---

[8] November 3, 2009, is after plaintiffs applied for their loan modifications, but before they filed the instant complaint.

> systemic problems.  In addition, to monitor participating servicers'
> compliance with the HAMP, Freddie Mac, at the direction of
> Treasury, instituted a second-look process in which it audits a
> sample of loan modification applications that have been denied to
> minimize the likelihood that borrower applications are overlooked
> or inadvertently denied.

*Williams,* 2009 WL 3757380, at *3.

The Due Process Clause does not mandate any more procedural protections than HAMP already provides.  Courts have rejected demands for additional notice requirements in similar situations.  For example, in *Woodsmall v. Lyng*, 816 F.2d 1241, 1246 (8th Cir. 1987), after being rejected for loans by the Farmers Home Administration, the plaintiffs argued that the Secretary of Agriculture's failure to promulgate more detailed standards to evaluate creditworthiness violated their due process rights.  The court squarely rejected the plaintiffs' argument, cognizant of the burden that the proposed notice would place upon the government:

> Finally, the government interest in maintaining flexibility and
> discretion in evaluating creditworthiness is significant.  The rural
> housing loan program is, after all, a loan program.  Each loan
> application *presents a different set of financial circumstances*,
> which the Secretary contends must be evaluated *on an individual
> basis*.  The Secretary argues that "an attempt to articulate fully all
> of the matters considered by a good loan officer would likely
> produce a mind-boggling regulatory quagmire."  We agree that the
> administrative burdens of requiring standards for evaluating
> creditworthiness would be undue in the context of the program.

*Id*. at 1247 (emphasis added; citations omitted).  Likewise, providing every applicant for a HAMP loan modification with the detailed notice that plaintiffs seek would result in a "mind-boggling" array of administrative burdens.  Such burdens are particular costly here given the critical importance of proceeding with loan modifications as quickly as possible.[9]  Plaintiffs'

---

[9]  *See* H.R. Rep. No. 111-19, at 8 (2009) ("In the 18 months since the Judiciary Committee first began exploring the foreclosure crisis, solutions offered by the industry and the Federal

(Footnote continues on next page.)

demand for a right to appeal modification decisions also fails because "[t]here is, of course, no constitutional right to an appeal." *Jones v. Barnes*, 463 U.S. 745, 751 (1983).

The Supreme Court has acknowledged that "the marginal gains from affording an additional procedural safeguard often may be outweighed by the societal cost of providing such a safeguard." *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 320-21 (finding that the Due Clause does not require that "the procedures used to guard against an erroneous deprivation . . . be so comprehensive as to preclude any possibility of error."). Plaintiffs' limited allegations demonstrate no significant risk of erroneous denials under HAMP. However, the additional procedures that plaintiffs seek would entail a considerable societal cost. HAMP is working to address the foreclosure crisis by modifying the mortgages of 3 million to 4 million borrowers by December 31, 2012. Mandating the additional procedures that plaintiffs demand could impede this goal, both by increasing the time it takes to process applications and by discouraging servicers from participating in the program.

## VII.   THE COURT SHOULD DEFER TO TREASURY'S RULE-MAKING AUTHORITY UNDER THE DOCTRINE OF PRIMARY JURISDICTION.

Finally, as a practical matter, the Court should defer to Treasury's rule-making authority to determine the appropriate HAMP procedures. The doctrine of primary jurisdiction "is a prudential doctrine under which courts may, under appropriate circumstances, determine that the initial decisionmaking responsibility should be performed by the relevant agency rather than the courts." *Syntek Semiconductor Co., Ltd. v. Microchip Tech. Inc.*, 307 F.3d 775, 780 (9th Cir. 2002). "[P]rimary jurisdiction is properly invoked when a claim is cognizable in federal court

(Footnote continued from previous page.)

Government have failed to address the problem . . . We are behind the curve. . . '[W]e need to act and we need to act quickly and we need to act dramatically.'") (internal citation omitted).

but requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency." *Id.* (citation omitted). The doctrine does not require that all claims touching on an agency's expertise first be decided by the agency. *Id.* "The particular agency deferred to must be one that Congress has vested with the authority to regulate an industry or activity such that it would be inconsistent with the statutory scheme to deny the agency's power to resolve the issues in question." *United States v. Culliton*, 328 F.3d 1074, 1082 (9th Cir. 2003) (citation omitted).

The primary jurisdiction doctrine seeks to produce better-informed and uniform rulings, and to promote proper working relationships between courts and administrative agencies, by allowing courts to take advantage of the specialized knowledge of an agency before judicial consideration of a claim. *See United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 63-65 (1956); *Syntek Semiconductor Co.*, 307 F.3d at 780 (primary jurisdiction is a "doctrine used by the courts to allocate initial decisionmaking responsibility between agencies and courts where such [jurisdictional] overlaps and potential for conflicts exist"). Although there is no fixed formula for its application, the primary jurisdiction doctrine generally considers "(1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory authority that (4) requires expertise or uniformity in administration." *Syntek Semiconductor*, 307 F.3d at 781.

All of these factors militate in favor of deference to Treasury's rule making authority here. First, by statute, oversight of HAMP is entrusted to Treasury. 12 U.S.C. § 5219. Second, Treasury is presently reviewing the program and continuously releasing new supplemental directives to ensure that the program achieves its intended purpose. (*See, e.g.*, S.D. 09-08,

attached to O'Brien Decl. as Exhibit F.)  Third, Treasury is the agency with the proper

specialization and expertise to review and modify the program.  Accordingly, in this case, the

"limited functions of review by the judiciary are more rationally exercised by preliminary resort"

to an agency "better equipped than courts" to resolve these issues in the first instance.  *Far East

Conference v. United States*, 342 U.S. 570, 574-75 (1952); *Western Pac. R.R. Co.*, 352 U.S. at

64-65.

**CONCLUSION**

For the foregoing reasons, Aurora Loan Services, LLC respectfully requests that the

Court dismiss Plaintiffs' Complaint in its entirety.

Dated: January 25, 2010                      Respectfully submitted,


                                   By:   */s/ Michael J. Agoglia*
                                          Michael J. Agoglia (*pro hac vice*)
                                          Wendy M. Garbers (*pro hac vice*)
                                          MORRISON & FOERSTER LLP
                                          425 Market Street
                                          San Francisco, CA  94105-2482
                                          Telephone: 415.268.7000

                                          Tim A. O'Brien (D.C. Bar #484700)
                                          MORRISON & FOERSTER LLP
                                          2000 Pennsylvania Ave., NW
                                          Washington, D.C.  20006-1888
                                          Telephone: 202.887.1500

                                          Attorneys for Defendant
                                          AURORA LOAN SERVICES, LLC

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that on January 25, 2010, I caused a true and correct copy of the foregoing Memorandum of Aurora Loan Services, LLC In Support of Its Motion to Dismiss to be electronically filed with the Clerk of the District Count using the CM/ECF system, which sent notification of such filing to all counsel of record.

Dated: January 25, 2010

*/s/  Tim A. O'Brien*
                Tim A. O'Brien

sf-2787790