IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

DOREEN EDWARDS, et al., )
        *Plaintiffs*, )
)    CASE NO.    1:09-cv-2100 BJR
v. )
)    ORDER DENYING PLAINTIFFS'
AURORA LOAN SERVICES, LLC, )    RULE 56(f) MOTION AND GRANTING
)    DEFENDANTS' MOTIONS TO DISMISS
et al., )
        *Defendants*. )
_____

This matter comes before the court on the following motions: (1) Defendant Aurora Loan Services, LLC's ("Aurora") Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6); (2) Defendants Federal National Mortgage Association, Michael J. Williams and Eric Schuppenhauer's (the "Fannie Mae Defendants") Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6); (3) Defendants Secretary Geithner and Assistant Secretary Allison's (the "Treasury Defendants") Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), or in the Alternative, for Summary Judgement pursuant to Fed. R. Civ. P 56(c); (4) Plaintiffs' Motion to Deny or Stay Treasury Defendants' Summary Judgement Motion pursuant to Rule 56(f); and (5) Treasury Defendants' Motion for a Protective Order to Stay Discovery. The court

1

has reviewed the relevant documents filed by the parties and, being fully informed, finds and rules as follows:

## I. INTRODUCTION

Plaintiffs are four homeowners who claim to have been eligible for, but who at the time of the filing of this action on November 9, 2009, had not received, Home Affordable Modification Program ("HAMP") loan modifications on their mortgages. HAMP is a program created by the Department of Treasury and the Federal Housing Finance Agency, which offers financial incentives to mortgage lenders to modify the home loans of borrowers in danger of foreclosure. Mortgage lenders or servicers enter into service participation agreements ("SPAs") with Fannie Mae agreeing to abide by a set of guidelines in evaluating applications for home mortgage modification.

Defendant Aurora is the servicer on each of the Plaintiffs' loans. Plaintiffs allege a series of contacts with Aurora that describes a dysfunctional program. Plaintiffs claim that their efforts to obtain HAMP modifications have been frustrated by endless bureaucratic incompetence coupled with a lack of effective recourse for wrongful denials. They claim that their HAMP applications have been misfiled, that their financial documents were repeatedly misplaced, and that they were given misinformation by Aurora regarding whether their loans are investor-owned.

## II. PROCEDURAL HISTORY

Plaintiffs filed this action in the United States District Court for the District of Columbia on November 9, 2009, and amended the complaint on March 4, 2010 (dkt. nos. 1 and 37), asserting three causes of action: (1) breach of the SPA between Aurora and Fannie Mae against Aurora, (2) breach of the implied covenant of good faith and fair dealing under the SPA against

2

Aurora, and (3) violation of the Due Process Clause against each of the Defendants. Plaintiffs seek declaratory and injunctive relief, requesting that the court mandate that the parties provide enhanced forms of notice for HAMP denials and create a new administrative appeals process.

On January 25, 2010, each Defendant moved to dismiss the amended complaint pursuant to Fed. Rules Civ. Prod. 12(b)(1), for lack of subject matter jurisdiction due to lack of standing, and 12(b)(6), for failure to state a claim on which relief can be granted. (Dkt. Nos. 21, 23 and 26.). In addition, the Treasury Defendants moved, in the alternative, for summary judgment. (Dkt. No. 23.).

On March 5, 2010, Plaintiffs moved pursuant to Rule 56(f) for an order denying or staying consideration of the Treasury Defendants' summary judgment motion pending discovery. (Dkt. No. 36.). The Treasury Defendants opposed the motion and, on March 24, 2010, filed a motion for a protective order to stay discovery. (Dkt. No. 41.).[1]

### III. BACKGROUND

As the gravity of the credit crisis emerged, Congress passed the Emergency Economic Stabilization Act ("EESA") signed into law on October 3, 2008. 12 U.S.C. § 5201 (2008). EESA is the implementing statute for the Troubled Asset Relief Program ("TARP"), and is responsible for implementing programs paid for by TARP expenditures. 12 U.S.C. §§ 5211, 5225 (2008). EESA allocated $700 billion to Treasury to restore liquidity and stability to the financial system. Enabled with this authority, on February 18, 2009, Treasury created the Making Home

---

[1] At the court's request, the parties submitted several joint status reports, updating the court on the status of each of the Plaintiffs' HAMP applications. (Dkt. Nos. 72, 75 and 77.), the last of which was filed on April 11, 2011. Plaintiffs object to assertions made by Defendants in the status reports on the ground that they have not been able to test the assertions because discovery is yet to be conducted. After reviewing the status reports, the court has determined the testimony contained therein is not necessary to the dispositions of the motions before it, and therefore, will be disregarded.

3

Affordable Program, a comprehensive plan to stabilize the U.S. housing market. *See* Amended Complaint, Dkt. No. 1 at ¶ 26. HAMP is a component of the Making Home Affordable Program.

Treasury entered into contracts with Fannie Mae, as financial agent, and Freddie Mac, as compliance agent, to administer HAMP. *See* Dkt. No. 1 at ¶¶ 32-33. Fannie Mae, in turn, entered into contracts with loan servicers, which required the servicers to comply with HAMP Guidelines. *Id*. Participation by servicers of non-Government-Sponsored Entity ("GSE") loans is voluntary and if there are future material changes to the HAMP program or guidelines, servicers have the unilateral right to opt out of HAMP. *See* Aurora SPA at ¶ 10(c), Ex. D attached to Dkt. No. 42. Treasury encourages loan servicer participation in HAMP by paying financial incentives to servicers and loan owners/investors that are sufficient to make a HAMP modification a better financial outcome than foreclosure for the servicer and investor. See Dkt. No. 1 at ¶ 33.

Many mortgage loans are held in securitization, which are pools of loans that have been bundled and placed in a trust that issues securities on the pool of loans. *Id*. at ¶¶ 26-27, 40. Such securities are usually held by a disparate pool of investors, and the securities are typically "tranched" into senior and subordinate securities. The related securitization agreement—generally known as a "pooling and servicing agreement" or "PSA"—typically imposes restrictions on modifications. These restrictions are usually in place to protect subordinate security holders, whose interests are more at risk from mortgage loan modifications than senior security holders. The HAMP SPAs recognize that loan servicers are bound by these pre-existing agreements with the investors. *Id*. at ¶¶ 26-27. Therefore, HAMP Guidelines do not require servicers to consider loans for HAMP modification where prohibited by the rules of the applicable PSA and/or other investor servicing agreements. *Id*.

4

If the loan is not investor-owned or if the investor consents to modification, a loan is evaluated for HAMP eligibility. First the loan must meet a threshold set of criteria set-forth in the HAMP Guidelines.[2] *Id*. at ¶ 35. If the loan meets the criteria, the servicer must apply the "Waterfall" to the loan. *Id*. at ¶ 37. The Waterfall consists of a sequence of steps servicers must apply in a prescribed order to achieve the "targeted monthly mortgage payment"—defined as 31 % of the borrower's gross monthly income. If the targeted monthly mortgage payment can be achieved through the Waterfall, then the servicer must evaluate the loan using Treasury's net present value ("NPV ") test.[3] *Id*. If the NPV test has a positive result then the Guidelines specify that the servicer must provide a 90 day trial period loan modification. *Id*. at ¶ 38. If the borrower remains current throughout the trial period, the servicer must then provide a loan modification.

Importantly, under the HAMP Guidelines, servicers are required to temporarily suspend foreclosure proceedings to allow borrowers sufficient time to file an application for HAMP modification. *Id*. at ¶ 30. Any foreclosure proceedings commenced before the loans were considered for HAMP modifications must be suspended. *Id*.

---

[2] The HAMP threshold criteria are: (1) the loan must be a first-lien mortgage originated on or before January 1, 2009; (2) the loan must be secured by a one-to-four unit property, one unit of which is the borrower's principal residence; (3) the property must not have been abandoned or condemned; (4) the current unpaid principal balance must be no greater than specified limits ($729,750 for a one-unit property up to $1,403,400 for a four-unit property); (5) the loan must be delinquent or default is reasonably foreseeable; (6) the borrower must have a monthly mortgage payment greater than 31 percent of monthly income, and have insufficient assets to make the payment; and (7) the borrower must be able to document a financial hardship.

[3] The NPV test compares the net present value of cash flow from the borrower's loan if modified under HAMP to the net present value of cash flow without modification. In other words, the test looks to see if a loan as modified yields a more positive financial outcome to the investor or other holder of the note secured by the mortgage than a foreclosure on the property would yield. Servicers with sufficiently large books of business are permitted to customize the NPV model to fit their unique loan portfolios. For instance, servicers can adjust the discount rate used in the NPV model to reflect how different investors value payments over time. Servicers are also permitted to adjust the default discount rate—based on a survey of the mortgage market by Freddie Mac—by up to 250 basis points. However, any proprietary NPV model must adhere to the guidelines and framework outlined in Treasury's model.

# IV. ANALYSIS

## A. *Standard of Review*

All Defendants have challenged Plaintiffs' standing to bring this lawsuit. A Rule 12(b)(1) motion to dismiss for lack of standing implicates subject matter jurisdiction, and the plaintiff bears the burden of establishing that the court has subject matter jurisdiction. *See Rasul v. Bush*, 215 F. Supp. 2d 55, 61 (D.D.C. 2002) *rev'd on other grounds*. A plaintiff's factual allegations in the complaint will bear closer scrutiny in resolving a 12(b)(1) motion than resolving a 12(b)(6) motion for failure to state a claim. *See Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13-14 (D.D.C. 2001) (quoting 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1350). In addition, each Defendant moves to dismiss the complaint for failure to state a claim on which relief can be granted. When ruling on a Rule 12(b)(6) motion to dismiss, a court must assume the veracity of all "well-pleaded factual allegations" in the complaint, but need not accept as true "'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949-1950 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). Nor should the court accept "legal conclusions cast in the form of factual allegations." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). A pleading must offer more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'…" *Iqbal*, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 555). Rather, plaintiff must plead factual allegations sufficient to raise the right to relief beyond the speculative level. *See Twombly*, 550 U.S. at 555.

## B. *Plaintiffs' Rule 56(f) Motion and Treasury Defendants' Motion for a Protective Order to Stay Discovery*

In addition it their motion to dismiss Treasury Defendants move, in the alternative, for summary judgment. Plaintiffs complain that they are unable to present facts essential to justify

6

their opposition to the summary judgment motion because no discovery has taken place in this action. Accordingly, pursuant to Rule 56(f) of the Federal Rule of Civil Procedure, Plaintiffs request that the court deny the summary judgment motion or, in the alternative, order a continuance to afford Plaintiffs the opportunity to take discovery. (Dkt. No. 36.).

The Treasury Defendants oppose the Rule 56(f) motion and move for a protective order to stay discovery, pursuant to Rule 26(c), pending the resolution of Treasury Defendants' dispositive motion. (Dkt. No. 41.). For the reasons set forth below, this case must be dismissed on Rule 12(b)(1) and 12(b)(6) grounds. Accordingly, Plaintiffs' Rule 56(f) motion is denied, and the Treasury Defendants' motion for a protective order is dismissed as moot.

*C.  Defendants' Motions to Dismiss*

Each Defendant has moved to dismiss the complaint pursuant to Rule 12(b)(1), subject matter jurisdiction, and 12(b)(6), failure to state a claim. Aurora argues that this court does not have subject matter jurisdiction because Plaintiffs are not parties to the contract and lack standing to enforce it. The Fannie Mae and Treasury Defendants argue that Plaintiffs lack standing to sue them because Plaintiffs' alleged injuries are not fairly traceable to any action by Fannie Mae or Treasury. All of the Defendants assert that Plaintiffs have failed to state a claim upon which relief can be granted because the complaint does not adequately allege a deprivation of a protected property interest.

*1.  Plaintiffs Lack Standing to Enforce the Aurora SPA*

Before securing injunctive relief against the Defendants, Plaintiffs must establish standing. *See, e.g., Crow Creek Sioux Tribe v. Brownlee,* 331 F.3d 912, 915 (D.C. Cir. 2003) ("[s]tanding is one of the essential prerequisites to jurisdiction under Article III"); *Texans Against Governmental Waste and Unconstitutional Conduct v. U.S. Dep't of the Treasury*, 619

F.Supp.2d 274 (N.D. Tex. 2009) (standing is a prerequisite to the court having the power to grant injunctive relief against the Secretary under EESA). A plaintiff bears the burden of establishing proper standing "at the outset of its case." *Sierra Club v. EPA*, 292 F.3d 895, 901 (D.C. Cir. 2002).

In order to establish standing to enforce the terms of the Aurora SPA, Plaintiffs must demonstrate that Fannie Mae and Aurora intended to make them third-party beneficiaries of the contract, as evidenced by the intent of the parties or language of the contract. Plaintiffs have not met this burden. Government contracts by their nature benefit the public, but only in rare circumstances will courts deem individual members of the public to be intended beneficiaries empowered to enforce those contracts in court. *See Restatement (Second) of Contracts* § 313(2) cmt. a (1981) ("Government contracts often benefit the public, but individual members of the public are treated as incidental beneficiaries unless a different intention is manifested."). This principle recognizes the complications that would ensue from private enforcement of government contracts by members of the general public. *See, e.g., German Alliance Ins. Co. v. Home Water Supply Co.*, 226 U.S. 220 (1912). To overcome the "basic contract principle that third party beneficiaries of a government contract are generally assumed to be merely *incidental* beneficiaries, and may not enforce the contract," a third party must show that the parties "clear[ly] inten[ded]" that the third party be permitted to sue to enforce the contract. *Beckett v. Air Line Pilots Ass'n*, 995 F.2d 280, 288 (D.C. Cir. 1993) (emphasis in original).

The "'clear intent' hurdle is not satisfied by a contract's recitation of interested constituencies, vague hortatory pronouncements, statements of purpose, explicit reference to a third party, or even a showing that the contract operates to the third parties' benefit and was entered into with them in mind." *County of Santa Clara v. Astra USA, Inc.,* 588 F.3d 1237, 1244

8

(9th Cir. 2009) *rev'd on other grounds*, 131 S.Ct. 1342 (2011). Instead, the precise language of the contract must demonstrate a *clear intent* to rebut the presumption that the third parties are merely incidental beneficiaries. *Id.*; *Barnstead Broadcasting Corp. v. Offshore*, 886 F.Supp. 874, 879-80 (D.D.C. 1995) (the parties to a contract must "directly and unequivocally intend to benefit a third-party"); *Beckett v. Air Line Pilots Ass'n*, 995 F.2d 280, 288 (D.C. Cir. 1993).

Plaintiffs have not established that clear intent here. Although the Aurora SPA was entered into as a means of assisting distressed homeowners, the contract does not evince an intent to establish the right to enforce the contract on the part of eligible borrowers. To the contrary, the SPA specifically identifies the contemplated beneficiaries of the agreement, a recitation that does not include Plaintiffs. Instead, the SPA states that it "shall inure to the benefit of…the parties to the Agreement and their permitted successors-in-interest." (Dkt. No. 24, Ex. B. at ¶ 11.E.).

In ascertaining whether parties to a contract intended to benefit a third party, courts also "ask whether the beneficiary would be reasonable in relying on the promise as manifesting an intention to confer a right on him or her." *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1211 (9th Cir. 2000) (citing *Restatement (Second) Contracts* § 302(1)(b) cmt. d). This court finds that the significant discretion built into the Aurora SPA and the HAMP Guidelines precludes a finding that Plaintiffs could have reasonably relied on receiving a loan modification. Plaintiffs' receipt of a HAMP modification is subject to a series of wholly discretionary decisions that must be made before such a modification can proceed. It is first subject to the discretion of Treasury, which is free to define the criteria for HAMP as it sees fit. Then Aurora must agree to participate in the program, and if the loan is investor-owned, the investors must agree to permit modification. The discretion does not stop there. Once in the

program, the SPAs give servicers broad discretion over which loans to modify. For instance, the SPA permits Aurora to customize its NPV model to determine HAMP eligibility in a number of ways. Aurora—at its own discretion—may alter the base NPV model using statistics drawn from its own portfolio. *See* Treasury's "*Base Net Present Value Model Documentation*" ver. 3.0 at 32, Ex. D. attached to Dkt. No. 42; *see also, Williams v. Geithner*, No. 09-1959, 2009 WL 3757380, *3 and *7 (D. Minn. Nov. 9, 2009) (noting that servicers retain "broad discretion" over the "calculation of the NPV," which drives which loans are modified). It may also—again in its own discretion—adjust the discount rate used in the NPV model to reflect how different investors value payments over time. *Id.; Williams*, 2009 WL 3757380, *3 and *7.

In the time since Plaintiffs filed this lawsuit, a number of district courts have addressed the question of whether eligible borrowers have standing to enforce the terms of HAMP SPAs as third-party beneficiaries. The vast majority of these courts have decided against the borrowers. *See, e.g., Hoffman v. Bank of America*, 2010 WL 2635773 (N.D.Cal. June 30, 2010) ("[T]he existing case law weighs decisively in favor of defendant: numerous district courts have interpreted identical HAMP agreements and have come to the conclusion that a borrower is not [an intended] third party beneficiary"). *See also*, *Gale v. Aurora Loan Services, LLC*, 2011 WL 1897671 (D. Utah May 18, 2011); *Nafso v. Wells Fargo Bank, N.A.*, 2011 WL 1575372 (E.D. Mich. April 26, 2011); *Grill v. BAC Home Loan Servicing, L.P.,* 2011 U.S. Dist. LEXIS 3771 (E.D.Cal. Jan. 13, 2011); *Stern-Obstefeld v. Bank of America,* 2011 WL 71476 (N.Y.Co.Ct. Jan. 4, 2010); *Orcilla v. Bank of America*, 2010 WL 5211507 (N.D.Cal. Dec. 16, 2010); *Speleos v. BAC Home Loans Servicing, L.P.*, 2010 WL 5174510 (D.Mass. Dec. 14, 2010); *Benito v. Indymac Mortg. Services*, 2010 WL 2130648 (D.Nev. 2010); *Martinez v. Bank of America*, 2010 WL 4290921 (D.Nev. Oct. 20, 2010); *Zoher v. Chase Home Financing*, 2010 WL 4064798 (S.D.

Florida Oct. 15, 2010); *Phu Van Nguyen v. BAC Home Loan Services, L.P.*, 2010 WL 3894986 (N.D.Cal. Oct. 1, 2010); *Hammonds v. Aurora Loan Services, Inc.*, 2010 WL 3859069 (C.D.Cal. Sept. 27, 2010); *McKensi v. Bank of America*, 2010 U.S. Dist. LEXIS 99540 (D.Mass. Sept. 22, 2010); *Vazquez v. Bank of America Home Loans*, 2010 WL 33853350 (D.Nev. Aug. 23, 2010); *Zeller v. Aurora Loan Servs., LLC*, 2010 U.S. Dist. LEXIS 80449 (W.D.Va. Aug. 10, 2010); *Wright v. Bank of America*, 2010 WL 2889117 (N.D.Cal. July 22, 2010); *Zendejas v. GMAC Wholesale Mortg. Corp.*, 2010 U.S. Dist. LEXIS 59793 (E.D.Cal. June 16, 2010); *Escobedo v. Countrywide Home Loans, Inc.*, 2009 WL 4981618 (S.D.Cal. Dec. 15, 2009).

This court is similarly persuaded. Plaintiffs have not pointed to anything in the Aurora SPA that demonstrates that the contracting parties intended to make eligible borrowers third-party beneficiaries of the SPA with enforceable rights. This failure, coupled with the significant discretion built into HAMP procedures, precludes eligible borrowers from reasonably relying on the SPA as granting them a right to force a loan modification through a legal action. Accordingly, Plaintiffs' lack standing to enforce the terms of the Aurora SPA. The breach of contract claim against Aurora must be dismissed.

> 2. *Aurora Does Not Owe Plaintiffs a Duty of Good Faith and Fair Dealing under the Aurora SPA*

Likewise, Plaintiffs' breach of the covenant of good faith and fair dealing claim against Aurora fails. The covenant of good faith and fair dealing is an implied duty that each party to a contract owes its contracting partner. *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005). As set forth above, Plaintiffs are neither parties to the SPA nor intended beneficiaries there under. As such, Aurora does not owe them any duties under the implied covenant.

11

### 3. Plaintiffs Have No Constitutionally Protected Property Interest in HAMP Loan Modifications

The Due Process Clause safeguards "the security of interests that a person has already acquired in specific [government] benefits," but it does not apply to every prospective advantage potentially afforded by government actions. *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 576 (1972). The claimant must have a protected property interest. *Id*. at 570. To constitute a property interest for purposes of the Clause, "a person clearly must have more than an abstract need or desire…[or] a unilateral expectation" of receiving a particular government benefit; "[h]e must, instead, have a legitimate claim of entitlement to it." *Id*. at 577. Property interests are not created by the Constitution itself but, "[r]ather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005). The question is not simply whether there is an expectation of certain government treatment, but whether the individual has an enforceable right to that treatment. *Id*. at 757.

Plaintiffs' due process claim fails for several reasons. First, Plaintiffs cannot establish a legitimate claim of entitlement to HAMP modifications. EESA precludes such a finding. Rather than requiring mandatory modifications, the statute only "encourage[s]" servicers to modify mortgages, providing that the Secretary should "encourage the servicers of the underlying mortgages…to take advantage of…available programs to minimize foreclosures. 12 U.S.C. § 5219(a)(1). EESA neither compels assistance to any identifiable category of borrowers or loans, nor mandates the form or scope of any mitigation measures to be provided. All such issues are left to the discretion of the Secretary. "ESSA does not create an absolute duty on the part of the Secretary to consent to loan modifications;" rather, "the statute provides that loans may be modified 'where appropriate'—a phrase that limits the Secretary's obligation and evinces a

12

Congressional intent to afford discretion in the decision whether to modify loans in certain circumstances." *Williams v. Geithner*, 2009 WL 3757380 at *6. This absence of any restriction on the government, requiring it to provide loan modifications according to established criteria, is fatal to Plaintiffs' Due Process Clause claim because ultimately, "[t]he ground for a constitutional claim, if any, must be found in statutes or other rules defining the obligations of the [relevant government] authority." *Connecticut Bd. of Pardons v. Dumschat*, 452 U.S. 458, 465 (1981); *see also Castle Rock*, 545 U.S. at 756 ("Our cases recognize that a benefit is not a protected entitlement if government officials may grant or deny it in their discretion.").

Plaintiffs contend that the HAMP Guidelines created a protected property interest in a loan modification. *Id*. This argument too must fail. The D.C. Circuit has already rejected a similar argument. In *Washington Legal Clinic for the Homeless v. Barry*, 107 F.3d 32 (D.C. Cir. 1997), the plaintiffs argued that procedures adopted by the D.C. Shelter Office created a legal entitlement in homeless persons to emergency shelter. The D.C. Circuit rejected that argument, finding that only statutes and regulations could create a constitutionally protected entitlement; the procedures that the Shelter Office had adopted, but remained free to change, could not do so:

> [N]either District statutes nor implementing regulations set forth standards or procedures for allocating scarce shelter space among eligible families. … If th[e Shelter Office's allocation] procedure were mandated by statute or regulation, eligible homeless families might well have a constitutionally protected entitlement to shelter…. But D.C. law does not mandate the [allocation procedure] … and nothing in the governing statutes or regulations prohibits the Shelter Office from again changing its allocation procedures.

*Id*. at 36-37. Based on this distinction—between statutes and regulations on the one hand, and an agency's current practices on the other—the D.C. Circuit held that "eligible families lack the 'legitimate claim of entitlement' necessary to create a constitutionally protected property right." *Id*. at 37. The court noted that, "outside the employment context, we have found no decision of

13

the Supreme Court or this Circuit holding that administrative rules or understandings existing wholly apart from legislation or regulations may create a property interest." *Id*. at 38. HAMP eligibility requirements are neither codified by Congress nor promulgated by Treasury through notice-and-comment rulemaking. Here, Treasury retains full discretion to end HAMP at any time and, as the agency already has done, to modify the program as it sees fit. This discretion precludes a finding of entitlement. *Id*. at 37-38.

In the time since Plaintiffs filed their complaint, a number of federal courts have considered virtually identical due process claims and rejected them, holding that the significant discretion built into HAMP precludes any finding of a protected property interest. In *Williams v. Geithner* the court noted the "broad discretion afforded to servicers in the modification process" and held that a putative class of HAMP-eligible borrowers could not demonstrate "a legitimate claim of entitlement to a loan modification" amounting to a protected property interest. *Williams*, 2009 WL 3757380 at *6-7. The *Williams* court recognized that the decision to modify a loan is based on the servicer's business decisions:

> Loan servicers seek to maximize their investments, and in doing so, make profitability determinations between modification or foreclosure, based in part on predictions about an individual borrower's likelihood of default. If the Secretary prescribed the exact criteria all servicers must use to determine whether a loan has a positive NPV (and therefore should be modified if the other criteria are satisfied) then servicers may choose to forego participating in the HAMP program so that they are not forced to modify loans that do not make financial sense. While Congress required the Secretary to implement a plan to assist distressed homeowners, that plan not only made servicer participation voluntary, but also afforded to program participants discretion on several variables that impact the NPV determination.

*Williams*, 2009 WL 3757380 at *7. *See also McInroy v. BAC Home Loan Services, L.P., 2011 WL 1770947 (D. Minn. May 9, 2011)* (EESA and HAMP do not create a constitutionally protected property interest in receiving a loan modification); *Nguyen v. BAC Home Loan*

*Services, L.P.*, 2010 WL 3894986 (N.D.Cal. Oct. 1, 2010) (same); *Orcilla v. Bank of America, N.A.*, 2010 U.S. Dist. LEXIS 133353 (N.D.Cal. Dec. 16, 2010) (same).

Plaintiffs urge the court to disregard *Williams*, as "incorrect and inconsistent" with District precedent. Dkt. No. 35 at 41. Contrary to the *Williams* court holding, Plaintiffs argue, the limited flexibility accorded to servicers in assigning values to inputs used in the NPV model does not defeat a claim to protected property. Plaintiffs argue that *George Washington University v. District of Columbia*, 318 F.3d 203 (D.C.Cir. 2003), *cert. denied*, 540 U.S. 824 (2003) correctly analyzes due process precedent and is binding on this court. In *George Washington University*, the District's zoning scheme permitted university use as a matter of right in areas zoned for high-density commercial use. For land zoned residential or "special purpose," the District's zoning scheme permitted university use as a special exception. The exception was to be granted if the parcel was "located so that it is not likely to become objectionable to neighboring property because of noise, traffic, number of students, or other objectionable conditions." *Id.* at 208. Rejecting the argument that the judgment and discretion inherent in applying such a standard defeated the university's claim to a property interest, the Court of Appeals held that this standard "clearly places 'substantive limitations on official discretion'" and therefore creates a property interest. *Id.* Plaintiffs argue that the reasoning of *George Washington University* compels the conclusion that the HAMP program rules create a constitutionally protected property interest. According to Plaintiffs, the limited discretion that Aurora may exercise in granting or denying a mortgage modification is substantially more constrained than the Zoning Board's discretion in *George Washington University*.

This court disagrees. Plaintiffs erroneously focus only on the final stage of the HAMP process—the servicers' evaluation of HAMP applicants for loan modifications—while ignoring

15

the series of wholly discretionary decisions that must be made before such an evaluation can proceed. As previously discussed, a borrower's ability to receive a loan modification is subject first to the discretion of Treasury (to create and maintain HAMP), their loan servicer (to participate in HAMP, and investors in a borrower's loan (to allow modification of the loan). It is only after each of these discretionary decisions is made in a manner that would allow a borrower's loan to be considered for HAMP that servicers can even incur an obligation to evaluate a loan for modification. The existence of so many discretionary points to the process renders any borrower's expectation and entitlement to a modification too uncertain to warrant protection under the Due Process Clause. *See, e.g., Castle Rock*, 545 U.S. at 764 ("uncertainty… preclude[s the] existence of a federally protectable property interest); *Washington Legal Clinic*, 107 F.3d at 37 ("[W]e must look to principles of due process, where the uncertainty of [the asserted property interest] due to the exercise of administrative discretion prevents the creation of a constitutionally protected entitlement.").

HAMP is a creative, complex, and still evolving program, created in response to a grave economic crisis. It was never designed to be a fixed government entitlement program. The expectation was that it would change as necessary, based on experience under the program and the shifting reality of the housing market. This results in uncertainty whether any particular borrower can expect to qualify for a HAMP modification. That uncertainty precludes recognition of a protected property interest. While the court sympathizes with Plaintiffs' frustrations in navigating (or attempting to navigate) a system rife with contradictions, non-responsiveness, and

inefficiency, not every frustration is enforceable in court. Plaintiffs' due process claim must be dismissed.[4]

## V. CONCLUSION

Based on the foregoing, it is HEREBY ORDERED that:

1. The Treasury Defendants' Motion to Dismiss is GRANTED;

2. The Fannie Mae Defendants' Motion to Dismiss is GRANTED;

3. Defendant Aurora's Motion to Dismiss is GRANTED;

4. The Treasury Defendants' Motion for Summary Judgment is DISMISSED as moot;

5. The Treasury Defendants' Motion for a Protective Order is DISMISSED as moot;

6. Plaintiffs' Rule 56(f) Motion is DENIED;

7. All other outstanding motions are DISMISSED as MOOT; and

8. Plaintiffs' request for declaratory and injunctive relief is DENIED.

NOW THIS CASE IS HEREBY DISMISSED.

DATED this 14th day of June, 2011.

A

Barbara Jacobs Rothstein
U.S. District Court Judge

---

[4] In reaching this decision, it is not necessary for the court to address whether Aurora's participation in HAMP is sufficient to constitute state action under the color of the law.